GOSS GRAPHIC SYSTEMS, INC., a
Delaware Corporation, Plaintiff,

v.

MAN ROLAND DRUCKMASCHINEN
AKTIENGESELLSCHAFT, a German
Corporation; Man Roland Inc., a De-
laware Corporation; Koenig & Bauer
Aktiengesellschaft, a German Corpo-
ration; KBA North American, Inc., a
Delaware Corporation; Tokyo Kikai
Seisakusho, Ltd., a Japanese Corpora-
tion; TKS (U.S.A.) Inc., a Delaware
Corporation; Mitsubishi Heavy Indus-
tries, Ltd., a Japanese Corporation;
and MLP U.S.A. Inc., a Delaware Cor-
poration, Defendants.

No. C00–35–MJM.

United States District Court,
N.D. Iowa,
Cedar Rapids Division.

March 12, 2001.

Patrick M. Roby, Robert M. Hogg, Elderkin Law Firm, Cedar Rapids, IA, William G. Schopf, Steven A. Weiss, Bradley

P. Nelson, Ian H. Fisher, Schopf & Weiss, Chicago, IL, for Plaintiff.

Stephen J. Holtman, Paul Petersen Morf, Simmons Perrine Albright Ellwood, Cedar Rapids, IA, Thomas B. Wilner, Jeffrey M. Winton, Stephen J. Marzen, Meredith Kolsky Lewis, Shearman & Sterling, Washington, DC, Ronald L. Luehrsmann, Timothy S. White, Matthew James Reilly, White & Johnson, PC, Cedar Rapids, IA, Kenneth G. Weigel, Paul F. Brinkman, Karen Walker, Kirkland & Ellis, Washington, DC, Nicholas V. Critelli, Jr., Nicholas Critelli Assoc., Des Moines, IA, Barry J. Reingold, Perkins Cole, LLP, Washington, DC, J. Michael Weston, Randall D. Armentrout, Moyer Bergman, Cedar Rapids, IA, Layla A. Hughes, Steptoe & Johnson, LLP, Washington, DC, Robert W. Fleishman, Eric C. Emerson, Tara R. Gingerich, Steptoe & Johnson, LLP, Washington, DC, for Defendants.

Thomas B. Wilner, Shearman & Sterling, Washington, DC, Pro se.

## OPINION and ORDER

MELLOY, District Judge.

This action involves allegations of illegal dumping brought pursuant to the Antidumping Act of 1916, 15 U.S.C. § 72 ("the 1916 Act"). Presently pending before this Court are the Defendants' motions to dismiss Goss Graphic Systems, Inc.'s ("Goss") complaint (Docs. 59 and 68 and 146) filed on August 29 and 31, 2000, and March 5, 2001, respectively.[1] The motions have been briefed by both parties and oral argument was heard by this Court on October 13, 2000. For the reasons stated herein, the Defendants' motions to dismiss are denied.

## I. INTRODUCTION

Goss brings the present action pursuant to the 1916 Antidumping Act alleging that the Defendants, foreign manufacturers of offset web printing presses for large newspapers and their import companies, have been illegally dumping their foreign-made products in the United States at prices far below the prices of such products in their country of origin with the intent of injuring or destroying the United States Newspaper Press industry. The Defendants MAN Roland Druckmaschinen Aktiengesellschaft, MAN Roland, Inc., Koenig & Bauer Aktiengesellschaft, KBA North American, Inc., Mitsubishi Heavy Industries, Ltd., and MLP U.S.A. Inc. move to dismiss Goss' complaint on four separate grounds: (1) Goss failed to allege the Defendants acted with predatory intent and therefore fails to state a claim under the 1916 Act; (2) Goss did not and cannot state a claim that the Defendants sold large newspaper printing presses within the United States at prices "substantially less than the actual market value or wholesale price of such articles in the principal markets of the country of their production or other foreign countries to which they are commonly exported"; (3) Goss' complaint does not and cannot allege that Koenig & Bauer Aktiengesellschaft, imported or assisted in importing newspaper printing presses and thus fails to state a claim against Koenig & Bauer Aktiengesellschaft, under the 1916 Act; and (4) this Court lack personal jurisdiction over Koenig & Bauer Aktiengesellschaft, and KBA North America, Inc. in this forum, and there is also improper venue as to these Defendants. Concomitantly, Tokyo Kikai

---

1. On March 3, 2001, MAN Roland Druckmaschinen Aktiengesellschaft moved this Court to dismiss Goss' complaint relying on the arguments and authorities stated in Defendants MAN Roland, Inc., Koenig & Bauer Aktiengesellschaft, KBA North American, Inc., Mitsu-

bishi Heavy Industries, Ltd., and MLP U.S.A. Inc.' pending motion. Accordingly, the Court's analysis and conclusion applies equally to MAN Roland Druckmaschinen Aktiengesellschaft's motion.

Seisakusho, Ltd., and TKS Inc. move to dismiss Goss' complaint alleging the actions underpinning Goss' complaint fall outside the requisite statute of limitations and, like their co-defendants' motion, Goss does not and cannot state a claim that the Defendants sold large newspaper printing presses within the United States at prices "substantially less than the actual market value or wholesale price of such articles in the principal markets of the country of their production or other foreign countries to which they are commonly exported" as required by the 1916 Act.

## II. *FACTS ALLEGED IN GOSS' COMPLAINT*

Plaintiff, Goss Graphic Systems, Inc. is a Delaware Corporation with its principal place of business in Westmont, Illinois. Goss manufactures and supplies Newspapers Presses, Newspaper Press additions and other printing press systems for newspaper, advertising, and commercial printing and publishing markets. Goss' manufacturing facilities in the United States are located in Cedar Rapids, Iowa.

Defendant MAN Roland Druckmaschinen Aktiengesellschaft ("MAN Germany") is a German corporation with its principal place of business in Offenbach, Germany. MAN Germany is a wholly owned subsidiary of MAN Aktiengesellschaft. MAN Germany manufactures Newspaper Presses and Newspaper Press additions in Germany. It distributes these products in Germany, the United States, and other countries through its affiliates and subsidiaries, including MAN Roland, Inc.

Defendant MAN Roland, Inc. ("MAN USA") is a Delaware Corporation with its principal place of business in Westmont, Illinois. MAN USA is a wholly owned subsidiary of MAN Capital Corporation, which in turn, is a wholly owned subsidiary of MAN Aktiengesellschaft. MAN USA imports, markets, and sells in the United States Newspaper Presses and Newspaper Press additions that are manufactured by MAN Germany.

Defendant Koenig & Bauer Aktiengesellschaft ("KBA Germany") is a German corporation with its principal place of business in Wuerzburg, Germany. KBA Germany manufactures Newspaper Presses and Newspaper Press additions in Germany. It distributes these products in Germany, the United States, and other countries through its subsidiaries, including KBA North American, Inc.

Defendant KBA North American, Inc. ("KBA NA") is a Delaware corporation with its principal place of business in York, Pennsylvania. KBA NA is a wholly owned subsidiary of KBA Germany. KBA NA imports, markets, and sells in the United States Newspaper Presses and Newspaper Press additions that are manufactured by KBA Germany.

Defendant Tokyo Kikai Seisakusho, Ltd. ("TKS Japan") is a Japanese corporation with its principal place of business in Tokyo, Japan. TKS Japan manufactures Newspaper Presses and Newspaper Press additions in Japan. It distributes these products in Japan, the United States, and other countries through its subsidiaries, including TKS Inc.

Defendant TKS Inc. ("TKS USA") is a Delaware corporation with its principal place of business in Richardson, Texas. TKS USA is a wholly owned subsidiary of TKS Japan. TKS USA imports, markets, and sells in the United States Newspaper Presses and Newspaper Press additions that are manufactured by TKS Japan.

Defendant Mitsubishi Heavy Industries, Ltd. ("Mitsubishi") is a Japanese corporation with its principal place of business in Tokyo, Japan. Mitsubishi manufactures Newspaper Presses and Newspaper Press additions in Japan. It distributes these

products in Japan, the United States, and other countries through its subsidiaries, including MLP U.S.A., Inc.

Defendant MLP U.S.A., Inc. ("MLP USA") is a Delaware corporation with its principal place of business in Lincolnshire, Illinois. MLP USA is owned by Mitsubishi and Mitsubishi Corporation. MLP USA imports, markets, sells, and services Newspaper Presses in the United States that are made by Mitsubishi.

In its complaint Goss alleges that "[f]or years, the Defendants have offered and sold Newspaper Presses and Newspaper Press additions in the United States at prices substantially less than their actual market value in other countries, after adding freight, tariffs, and other charges and expenses. The Defendants have undertaken this conduct—called 'dumping'—in a deliberate effort to destroy or injure the United States Newspaper Press Industry."

In support of these allegations Goss points to the United States Government's investigation into the Defendants' alleged dumping, the Government's ultimate conclusion that the Defendants did engage in dumping in violation of the 1930 Tariff Act and finally the Government's imposition of tariffs on the Defendants. Goss further alleges that despite the Government's findings and imposed tariffs, the Defendants continued to illegally dump their foreign made products in the United States.

Goss contends "[t]he Defendants' conduct has had the intended effect of substantially suppressing Newspaper Press prices in the United States below Newspaper Press prices in foreign markets, and thus, injuring the United States Newspaper Press industry."

These actions, Goss maintains, amount to violations of the Antidumping Act of 1916, 15 U.S.C. § 72. Goss avers they have been injured and continue to be injured by the Defendants' violations and Goss seeks threefold damages, costs of the suit and reasonable attorney's fees.

### III. STANDARD OF REVIEW FOR RULE 12(b)(6) MOTION TO DISMISS

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) requires the court to review only the pleadings to determine whether they state a claim upon which relief can be granted. See Fed. R.Civ.P. 12(b)(6). In considering a motion to dismiss, the court must assume that all facts alleged in a plaintiff's complaint are true, and must liberally construe those alleged facts. See Zinermon v. Burch, 494 U.S. 113, 118, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990); Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); see also Doe v. Norwest Bank Minnesota, N.A., 107 F.3d 1297, 1303–04 (8th Cir. 1997); Fusco v. Xerox Corp., 676 F.2d 332, 334 (8th Cir.1982) (finding complaint must be construed liberally, taking all reasonable inferences in favor of the plaintiff).

This Court is cognizant that a motion to dismiss a complaint should not be granted unless it appears beyond a doubt that the plaintiff can prove no set of facts which would entitle the plaintiff to relief. See Conley, 355 U.S. at 45–46, 78 S.Ct. 99; Morton v. Becker, 793 F.2d 185, 187 (8th Cir.1986). Indeed, the issue is not whether a plaintiff will prevail, but whether a plaintiff is entitled to offer evidence to support its claims. See Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), overruled on other grounds by, Davis v. Scherer, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984); United States v. Aceto Agric. Chem. Corp., 872 F.2d 1373, 1376 (8th Cir.1989). Hence, "[a] motion to dismiss should be granted as a practical matter only in the unusual case in which a plaintiff includes allegations that show on the face of the com-

plaint that there is some insuperable bar to relief." *Frey v. City of Herculaneum,* 44 F.3d 667, 671 (8th Cir.1995) (internal quotations omitted).

## IV. *DISCUSSION*

### A. Did Goss allege the Defendants acted with the requisite intent to state a claim under the 1916 Antidumping Act?

#### 1. *Statutory Analysis*

■ The 1916 Antidumping Act prohibits discriminatory pricing if such pricing is done with "the intent of destroying or injuring an industry in the United States, or of preventing the establishment of an industry in the United States, or of restraining or monopolizing any part of trade and commerce in such articles in the United States." 15 U.S.C. § 72. The Defendants' primary challenge to Goss' complaint is premised on the notion that the aforementioned intent element requires a showing of predatory intent. Predatory intent, as urged by the Defendants, was defined by the Supreme Court in *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993), in the context of domestic antitrust laws. There, the Supreme Court explained that a plaintiff alleging price discrimination under the domestic antitrust laws must show that the alleged below-cost pricing was intended to drive out competitors, and the defendants' actions would create subsequent market conditions in which they could raise the price and recoup any loss they may have incurred through the below-cost pricing. *See id.* at 221–22, 113 S.Ct. 2578. Because Goss has in fact not alleged predatory intent, as prescribed by the Supreme Court in *Brooke Group,* the Defendants maintain Goss' complaint fails as a matter of law. The question for this Court then is whether the Defendants are correct that

the 1916 Antidumping Act indeed requires such a showing.

Long-established canons of statutory construction require this Court to look first to the explicit language of the statute. *See Salinas v. United States,* 522 U.S. 52, 59–61, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997) (stating "[c]ourts in applying criminal laws generally must follow the plain and unambiguous meaning of the statutory language"); *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980) (stating "the starting point for interpreting a statute is the language of the statute itself"); *see also United States v. Smith,* 171 F.3d 617, 620 (8th Cir.1999) (stating "[i]n construing a statute, we look first to the plain meaning of the words of the statute"). If the statute is clear and unambiguous on its face, the judicial inquiry is complete. *See Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) (stating "[w]hen the words of a statute are unambiguous, then, this first canon [of statutory construction] is also the last: 'judicial inquiry is complete.'"(internal quotations omitted)); *see also In re Erickson Partnership,* 856 F.2d 1068, 1070 (8th Cir.1988) (same).

The 1916 Antidumping Act provides in pertinent part:

It shall be unlawful for any person importing or assisting in importing any articles from any foreign country into the United States, commonly and systematically to import, sell or cause to be imported or sold such articles within the United States at a price substantially less than the actual market value or wholesale price of such articles, at the time of exportation to the United States, in the principal markets or the country of their production, or of other foreign countries to which they are commonly

exported after adding to such market value or wholesale price, freight, duty, and other charges and expenses necessarily incident to the importation and sale thereof in the United States: Provided, That such act or acts be done with the intent of destroying or injuring an industry in the United States, or of preventing the establishment of an industry in the United States, or of restraining or monopolizing any part of the trade and commerce in such articles in the United States.

15 U.S.C. § 72.

The Act therefore, through no uncertain terms, prohibits the systematic importing of articles into the United States at a price substantially less than the actual market value or wholesale price of such articles in the principal markets or the country of their production, done with one or more of the following intentions:

1) to destroy a United States industry;

2) to injure a United States industry;

3) to prevent the establishment of a United States industry;

4) to restrain trade and commerce in the subject market; or

5) the intent to monopolize trade and commerce in the subject market.

Thus, as this Court reads the 1916 Act, the language clearly and unambiguously prescribes five ways in which one might prove a defendant's intent to discriminate regarding price and Goss has pled two of those ways—(1) intent to destroy an industry in the United States and (2) intent to injure an industry in the United States. Defendants' contention that a plaintiff must show predatory intent as defined by *Brooke Group* is simply not supported by the plain and unambiguous language of the 1916 Act.

Although the 1916 Act has rarely been employed, whether it requires a showing of predatory intent is not an entirely new topic for the courts. Indeed, five U.S.

District Courts have had occasion to address the Act's intent requirements, with varying degrees of specificity. *See Wheeling–Pittsburgh Steel Corp. v. Mitsui Co.*, 35 F.Supp.2d 597, 600 (S.D.Ohio 1999); *Geneva Steel Co. v. Ranger Steel Supply Corp.*, 980 F.Supp. 1209, 1216 (D.Utah 1997); *Helmac Prods. Corp. v. Roth Corp.*, 814 F.Supp. 560, 576 (E.D.Mich.1992); *In re Japanese Electronic Products*, 494 F.Supp. 1190, 1201 (E.D.Pa.1980); *Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.*, 402 F.Supp. 251, 259 –260 (E.D.Pa.1975).

In support of its interpretation the Defendants direct this Court's attention to the first two courts to touch on the 1916 Act's intent element, *Zenith Radio Corp.*, 402 F.Supp. 251, and *In re Japanese Electronic Products*, 494 F.Supp. 1190, both part of a ten-year antitrust and antidumping litigation generating over fifteen opinions. In the first of these two cases, the issue of predatory intent was not squarely before the court, but rather at issue was whether the 1916 Act was void for vagueness. *See* 402 F.Supp. at 254. In *Zenith Radio*, Judge Higginbotham upheld the validity of the 1916 Act against the constitutional challenge finding the terms were clear with ascertainable meaning. *See id.* at 255–58. The Defendants note that in reaching this conclusion, Judge Higginbotham observed: "As I read the Act, it forbids regular, continued price discrimination between purchasers in different national markets whenever the discrimination is motivated by a desire to destroy competition," *Zenith Radio Corp.*, 402 F.Supp. at 259, and went on to add "Section 3 of the Robinson–Patman Act, ... is virtually the same as the predatory intent requirement of 15 U.S.C. Section 72." *Id.* at 260. The Defendants place great weight on Judge Higginbotham's use of the phrase "predatory intent." But as the Court has already noted, the 1916

Act's required intent was not before the court in *Zenith Radio*. *See* 402 F.Supp. at 259. Rather that court cited the intent language as further evidence of the statute's sufficient specificity and used the phrase "predatory intent" in dicta. *See* 402 F.Supp. at 259. More importantly, however, this opinion came some 18 years prior to the Supreme Court's decision in *Brooke Group*. Thus, the notion that this Court should superimpose *Brooke Group's* heightened predatory intent requirement on the 1916 Act based on an earlier court's use of the phrase "predatory intent" in dicta is simply without merit.

The second of the two cases heavily relied upon by the Defendants also was not charged with discerning the intent element of the 1916 Act. *See In re Japanese Electronic Products*, 494 F.Supp. at 1197. Instead, "[t]he precise question before [that court was] whether TV sets and other consumer electronic products manufactured for sale and use in the United States, as a class, and consumer electronic products manufactured for sale and use in Japan, as a class, are sufficiently similar to be comparable for purposes of the 1916 Act." 494 F.Supp. at 1196. Judge Becker held that "to give rise to a violation of the 1916 Act, the products sold in the United States and the products sold in the foreign country must be of 'like grade and quality' as that phrase is used in § 2 of the Clayton Act as amended by the Robinson–Patman Act, 15 U.S.C. § 13." *In re Japanese Electronic Products*, 494 F.Supp. at 1197. Judge Becker surmised from his analysis of the statutory text "that the 1916 Act is an antitrust, not a protectionist statute," *id.* at 1215, and concluded later, after an exhaustive review of the legislative history, that "[t]he principal lesson which we draw from the legislative history of the 1916 Act, viewed against the historical background . . . is that the statute should be interpreted whenever possible to parallel the 'unfair competition' law appli-cable to domestic commerce. Since the 1916 Antidumping Act is a price discrimination law, it should be read in tandem with the domestic price discrimination law . . ." *Id.* at 1223.

The Defendants urge Judge Becker's interpretation in the present case, yet it is not entirely clear that his ruling is advantageous to them. As an initial matter, Judge Becker notes that the 1916 Act should be construed like domestic antitrust laws "whenever possible." *Id.* at 1223. Moreover, Judge Becker also stated, referring specifically to the intent requirement of the Act, that "[t]he 1916 Antidumping Act, unlike e. g. section 2 of the Sherman Act, does not require plaintiffs to show that any defendant's predatory intent was accompanied by a dangerous probability of success," 494 F.Supp. at 1201 n. 12, which is precisely the standard the Defendants advance in the present case. And again, Judge Becker was not charged with deciphering the Act's requisite showing of intent and his opinion came out some thirteen years prior to *Brooke Group*. For these reasons, this Court is not inclined to diverge from the plain language of the 1916 Act, and adopt a heightened predatory intent requirement based on an earlier court's ruling that the 1916 Act has no protectionist underpinnings. Defendants' attempt "to circumscribe the statutory text by pointing to its legislative history" and argue that it is essentially an antitrust statute is unpersuasive. *Salinas*, 118 S.Ct. at 474; *see also In re Erickson Partnership*, 856 F.2d at 1070 (holding "[t]he mere fact that statutory provisions conflict with language in the legislative history is not an exceptional circumstance permitting a court to apply the legislative history rather than the statute"). This Court declines the Defendants' invitation to parse through sparse legislative history to discern what is readily discernable from the language of the 1916 Act itself.

Apart from the cases relied upon by the Defendants, three other U.S. District courts had occasion to analyze this statute and, significantly, did so with the benefit of the holding in *Brooke Group*. *See Wheeling–Pittsburgh*, 35 F.Supp.2d at 601–05; *Geneva Steel*, 980 F.Supp. at 1216; and *Helmac Prods.*, 814 F.Supp. at 576. While recognizing the Act had antitrust concerns, these courts found the Act had protectionist concerns which distinguished it from cases prosecuted pursuant to domestic antitrust laws. *See Wheeling–Pittsburgh*, 35 F.Supp.2d at 601–05 (distinguishing language of domestic antitrust laws from that of 1916 Act); *Geneva Steel*, 980 F.Supp. at 1216 (explaining "the 1916 Act has a protectionist reach beyond antitrust and traditional predatory price-discrimination pleading requirements"); and *Helmac Prods.*, 814 F.Supp. at 576 (recognizing distinction between the 1916 Act and antitrust laws in that antitrust laws focus on the alleged violations' effect on competition as opposed to the competitor). Two of these courts, like this one, were faced squarely with the question of whether the 1916 Act required a showing of predatory intent, and each concluded the 1916 Act was unambiguous on its face and did not require the plaintiff to make such a showing. *See Wheeling–Pittsburgh*, 35 F.Supp.2d at 600; and *Geneva Steel*, 980 F.Supp. at 1216.

In *Geneva Steel* the court held that the Antidumping Act of 1916 did not require the type of predatory intent defined in *Brooke Group* because, in part, the statute "has a protectionist reach beyond antitrust and traditional predatory price-discrimination pleading requirements." *Geneva Steel*, 980 F.Supp. at 1217. Likewise, in *Wheeling–Pittsburgh*, the court held that "[w]hile the Sherman, Clayton, and Robinson–Patman Acts expressly protect competition, the language of the Antidumping Act of 1916 seeks to prevent 'injury to industry' from cut-throat pricing by

international manufacturers" and plaintiffs' failure to allege predatory pricing by which the defendants could reasonably gain market dominance and subsequently raise prices to recoup losses incurred by selling at a cut-throat price is of no consequence. *See* 35 F.Supp.2d at 605.

In this Court's view, the conclusion reached by both *Wheeling–Pittsburgh* and *Geneva Steel* is correct. As succinctly stated by the *Geneva Steel* court:

> the language of the Act itself, in addition to prohibiting antitrust violations, clearly and literally prohibits non-antitrust and non-predatory pricing conduct. By the words it chose, Congress protected United States industries from unfair dumping, whether the dumper possessed predatory intent or not. The intent required is the intent to "injure" a domestic United States industry. When the Act states that it is unlawful to sell dumped goods with the specific intent to injure a United States industry, it means precisely that. The Defendants want to add the limitation that such injury can only occur if predatory pricing is involved, but the Act simply does not say so.

980 F.Supp. at 1217.

2. *Appropriate Weight to be Accorded to the USTR's Position on Intent*

■ The Court is cognizant that this case has one aspect which sets it apart from its predecessors, and that is the recently stated position of the Executive. In recent dispute settlement proceedings concerning the consistency of the 1916 Antidumping Act with the United States' obligations under the World Trade Organization ("WTO") Agreements, the United States Trade Representative ("USTR") explained that the intent requirement of the 1916 Act should be interpreted in the same manner as the predatory intent requirement of

domestic price discrimination claims under the Robinson–Patman Act and predatory pricing claims under the Sherman Act. Specifically, the USTR stated that "[t]he 1916 Act requires a finding that the pricing at issue be undertaken with a predatory intent ... similar to that found in Section 2 of the Sherman Act and in so-called primary line cases under the Robinson–Patman Act." First U.S. Submission in Japan Proceeding ¶ 14(b); *accord* First U.S. Submission in EC Proceeding ¶¶ 24(b), 106 ("evidence of the requisite intent under the 1916 Act is essentially the same predatory intent contemplated by the Robinson–Patman Act"). The Defendants urge this Court to accord substantial deference to the USTR representations to the WTO because of the well established proposition that deference should be allotted to the Executive Branch in areas of foreign affairs.

This Court is aware the Executive Branch is awarded great latitude on resolving issues regarding foreign affairs. *See First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 767, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972) (plurality opinion) (noting the "primacy of the Executive in the conduct of foreign relations" and the Executive Branch's lead role in foreign policy). As evinced by the cases relied upon by the Defendants, courts have historically granted substantial deference to the Executive in the area of foreign affairs, in two areas in particular. One area, and the most common, is when a Executive agency is charged by Congress with the interpretation and the administration of a statute. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council*, Inc., 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (noting the Court has "long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpreta-

tions"); *Gonzalez v. Reno*, 212 F.3d 1338, 1349 (11th Cir.) (holding INS has authority to dictate asylum application procedure when statute is silent on the issue where INS has delegated the agency to interpret the statute by Congress), *cert. denied*, 530 U.S. 1270, 120 S.Ct. 2737, 147 L.Ed.2d 1001 (2000); *Federal–Mogul Corp. v. United States*, 63 F.3d 1572, 1580 (Fed.Cir. 1995) (giving deference to an agency's interpretation of a statute, the court explained "[t]he question of whether, and to what extent, the Agency's approach to this problem is entitled to deference is not lightly decided. For one, *Chevron* deference is a limited relinquishment of judicial power to declare what the law is. It is available when Congress leaves to an agency the choice of a course to follow in pursuit of a Congressional purpose, embodied in a statute, and the agency has issued regulations or taken other considered and official action, declaring that course. If the course the agency has chosen is reasonable, that is, a permissible one under the law, courts do not exercise their usual power to declare what the law is. The agency is entitled in such circumstances to make that decision. That is what *Chevron* teaches."); *Taiwan v. U.S. District Court for the Northern District of Cal.*, 128 F.3d 712, 718–19 (9th Cir.1997) (concerning diplomatic immunity for an employee of TECRO, court gave "substantial deference" to State Department's interpretation of an act where Congress had granted President authority to extend diplomatic protections to TECRO employees); *United States v. Fernandez–Pertierra*, 523 F.Supp. 1135, 1141 (S.D.Fla.1981) (holding President acted within his authority when issuing regulations pursuant to the Trading With Enemy Act ("TWEA")); *Tax Analysts and Advocates v. Simon*, 390 F.Supp. 927, 942 (D.D.C.1975) (allotting deference to IRS revenue rulings pursuant to the Internal Revenue Code).

Another area in which courts cede their judicial authority to the Executive is in cases where the issue to be resolved is considered a political question; that is, although a federal court has jurisdiction over a dispute, it "should decline to adjudicate it on the ground that the case raises questions which should be addressed by the political branches of government." *Iwanowa v. Ford Motor Co.*, 67 F.Supp.2d 424, 483 (D.N.J.1999). Again turning to the cases relied upon by the Defendants, this doctrine is not one of deference but rather an instance where a court concludes an issue is not "justiciable in federal court because of the separation of powers provided by the Constitution." *Id.* (citing *Powell v. McCormack*, 395 U.S. 486, 516–17, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969)). Because of the significance of ceding judicial authority to the Executive under the political question doctrine, the Supreme Court has carefully delineated factors to consider when it is appropriate. *See Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (finding courts should consider: (1) a demonstrable constitutional commitment of the issue to a coordinate political department; or (2) the lack of judicially discoverable and manageable standards for resolving it; or (3) the impossibility of making a decision without first making a policy determination of the type clearly outside judicial discretion; or (4) the court's inability to resolve the issue without expressing lack of respect to the coordinate branches of government; or (5) an unusual need for unquestioning adherence to a political decision already made; or (6) the potential for embarrassment from multifarious pronouncements by various departments on one question); *see also Iwanowa*, 67 F.Supp.2d at 483.

Although the previous cases are those cited by the Defendants, they concede that the present scenario does not fall into either category—administrative agency or political question. *See* Defendants' Reply Brief, p. 6. Instead the Defendants cite these cases for a more general proposition that where a statute's language is ambiguous, a court should grant substantial deference to the Executive's interpretation of statutes when its interpretation affects the conduct of foreign affairs. *See id.* This Court is not convinced that representations made by the USTR in an adversary proceeding before a foreign body made in an effort to salvage legislation under particular scrutiny warrant the kind of judicial deference discussed in the cases cited by the Defendant.[2] Nor does this Court find the language of the statute to be ambiguous, as explained earlier. That said, the Court is cognizant of the import of the Executive's position on issues of foreign

---

**2.** The Defendants also cite *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 120 S.Ct. 2288, 2290–91, 147 L.Ed.2d 352 (2000) and *Pfizer, Inc. v. Government of India*, 434 U.S. 308, 98 S.Ct. 584, 54 L.Ed.2d 563 (1978), for the proposition that this Court should defer to the Executive in the area of foreign affairs. These cases, however, are inapposite. In *Crosby* the Supreme Court carried out a detailed analysis before concluding a Massachusetts Act was preempted by a federal act. Contrary to the Defendants' position that the Supreme Court gave deference to the Executive in coming to this conclusion, the Court merely stated in a footnote that its conclusion was not inconsistent with that es-

poused by the Executive. The Court did not place great weight on the Executive's position in reaching its conclusion, but instead employed the traditional methods of statutory construction.

Likewise, in *Pfizer* the Supreme Court did not afford great deference to the Executive's position in resolving the issue before it—whether a foreign country is considered a person for purposes of domestic anti-trust laws. *See* 434 U.S. at 312–19, 98 S.Ct. 584. Rather it simply noted that its ruling did not run contrary to the long recognized rule that is was in the exclusive power to the Executive Branch to determine which nations are entitled to sue. *See id.* at 319, 98 S.Ct. 584.

affairs and deems it prudent to take it into consideration. This does not however, change the Court's ultimate conclusion that the statute does not warrant a predatory intent showing. The Executive's position is contrary to the conclusion of the plain language of the Act and the conclusion of three independent United States District Courts. What's more, the body before which the USTR made its representations did not adopt the Executive's interpretation of the Act. *See WTO DSB Report,* at 95; *aff'd Report of the Appellate Body,* ¶ 155(c). For these reasons, and those stated earlier, this Court declines to adopt the Executive's position that the Act requires a showing of predatory intent. While "[r]espect for the authority of the executive branch in foreign affairs is a well-established theme in our law. . . .," it "does not mean [however] that the executive branch has unbridled discretion in creating and in implementing policy." *Gonzalez,* 212 F.3d at 1349.

Goss' complaint sufficiently alleges the requisite intent in order to state a cause of action under the 1916 Act.

B. *Has Goss adequately alleged that the Defendants sold large newspaper printing presses within the United States at prices "substantially less than the actual market value or wholesale price of such articles in the principal markets of the country of their production or other foreign countries to which they are commonly exported"?* [3]

■ To prevail under the 1916 Antidumping Act a plaintiff must establish that the defendant sold articles within the United States at prices "substantially less than the actual market value or wholesale price of such articles . . . in the principal mar-

kets of the country of their production, or of other foreign countries to which they are commonly exported." 15 U.S.C. § 72. The Defendants maintain that in order for Goss' complaint to survive a motion to dismiss, it must compare the prices for comparable products. The Defendants argue Goss' complaint contains no such allegations. Instead, the Defendants aver Goss relies entirely on the findings of the Department of Commerce ("DOC") and the International Trade Commission ("ITC") which are insufficient to state a claim as a matter of law because neither the DOC nor the ITC based their findings on a price to price comparison. Moreover, the Defendants argue Goss represented to the DOC that price to price comparisons were not possible and is now judicially estopped from arguing otherwise.

In response, Goss maintains its allegations are not simply based on the DOC and ITC findings and that it has in fact alleged that the Defendants have been selling and/or importing for sale their presses in the United States at *prices* "substantially less than the actual market value or wholesale price" of such products in the Defendants' home markets or other markets to which they are commonly exported. Goss maintains it is not judicially estopped from making price to price comparisons and concludes that irrespective of whether it is judicially estopped, the 1916 Act does not require that a plaintiff make a price to price comparison in order to prevail.

In view of the foregoing challenges, the Court will begin its inquiry with whether Goss adequately alleged a price to price comparison, and whether it is judicially estopped from doing so. Assuming Goss can and did allege a price to price comparison, whether it must do so in order to

---

**3.** As stated in the introduction, the challenges raised in this section are lodged by the Defendants MAN Germany, MAN USA, KBA Ger-

many and KBA NA as well as TKS Japan and TKS USA.

state a claim under the 1916 Act is not central to the resolution of the Defendants' motion to dismiss.[4]

In its complaint, Goss begins by describing the nature of the claim—the Defendants "have been illegally dumping their foreign-made products in the United States at prices far below prices of such products in their countries of origin." *Complaint* ¶ 1. Goss then goes into further detail providing background facts describing the printing presses, press components and additions at issue as well as the bidding process. *See Complaint* ¶¶ 14–15, 21–23. Goss alleges facts to establish each of the Defendants' presses are foreign made. *See Complaint* ¶¶ 3–10, 18. Goss uses the facts to underpin its allegation that "[f]or years the Defendants have offered and sold Newspaper Presses and Newspaper Press additions in the United States at prices substantially less than their actual market value in other countries, after adding freight, tariffs, and other charges and expenses." *Complaint* ¶ 24. While Goss also includes the findings of the DOC and the ITC that newspaper printing presses and components imported from Germany and Japan respectively were being sold in or were likely being sold in the United States at less than their fair value and this was in violation of the Tariff Act of 1930, *see Com-*

*plaint* ¶¶ 28 & 29, it does not stop there; rather Goss goes on to allege that "[d]espite the findings of the ITC and the DOC, and even though the Defendants must pay tariffs on their sales of large newspaper printing presses, the Defendants continue to illegally dump their foreign-made products in the United States." *Complaint*, ¶ 33. Goss concludes by describing the harm Goss has allegedly suffered "[a]s a result of the Defendants' domestic pricing below their foreign market prices." *Complaint*, ¶ 35.

Federal Rule of Civil Procedure 8(a)(2) requires a plaintiff to plead only "a short and plain statement of the claim showing that the pleader is entitled to relief...." *See Conley*, 355 U.S. at 47, 78 S.Ct. 99.[5] "The essential function of a complaint under the Federal Rules of Civil Procedure is to give the opposing party 'fair notice of the nature and basis or grounds for a claim, and a general indication of the type of litigation involved.'" *Hopkins v. Saunders*, 199 F.3d 968, 973 (8th Cir.1999) (quoting *Redland Ins. Co. v. Shelter Gen. Ins. Cos.*, 121 F.3d 443, 446 (8th Cir.1997)). The Court is cognizant that "'a complaint must contain facts sufficient to state a claim as a matter of law and must not be merely conclusory in its allegations.'" *Hanten v. School Dist. of Riverview Gar-*

---

4. The Court notes however, that to the extent a price to price comparison is required by the 1916 Act, and Goss cannot ultimately make that showing, Goss' reliance on the DOC and ITC findings, which were not based on a price to price comparison, would appear to be insufficient to state a claim as a matter of law. For essentially this reason, the Defendants request this Court to strike the DOC and ITC allegations as immaterial pursuant to Fed. .R.Civ.P. 12(f). The Court is not inclined to begin striking evidence from the record at the motion to dismiss stage. This argument is more appropriately made in a motion for summary judgment or indeed, as a motion in limine to the extent the Defendants' argument is based on the notion that such evidence

"would be confusing to the trier of fact and could have no other purpose that to unfairly prejudice the Defendants." *See* Defendants Opening Br. 45–46 n.33.

5. The Court is not convinced by the Defendants' argument that a statute which provides criminal as well as civil remedies, like the 1916 Act, warrants a more stringent pleading requirement than that of Fed.R.Civ.P. 8(b)(2), regardless of whether the party is proceeding under the civil arm of the statute or not. Like the *Geneva Steel* court, this Court finds Goss has sufficiently stated a civil claim by tracking the language of the 1916 Act. *See* 980 F.Supp. at 1225.

*dens,* 183 F.3d 799, 805 (8th Cir.1999) (quoting *Springdale Education Association v. Springdale School District,* 133 F.3d 649, 651 (8th Cir.1998)). After a thorough review of the pleadings this Court believes Goss has sufficiently alleged facts which would support a price to price comparison, and has adequately provided the Defendants with "fair notice of the nature and . . . grounds for a claim." [6]

The question then becomes whether Goss is judicially estopped from making such a comparison because of earlier assertions made to the DOC. It appears from this Court's view of the record that Defendants' contention that Goss represented to the DOC that a price to price comparison is wholly impossible is inaccurate. While Goss did originally state that a price to price comparison would likely be impossible to make, it went on to clarify that position throughout the proceedings, urging the DOC in certain instances to carry out such a comparison.

In Goss' initial petition to the DOC it maintained:

> Based on Petitioner's extensive knowledge of U.S. and Japanese large newspaper printing presses, Petitioner believes that large newspaper printing presses sold in Japan differ substantially from the merchandise sold in the United States. Japanese newspapers typically have fewer pages than U.S. newspapers, so large newspaper printing presses sold in Japan have fewer units, fewer RTPs and smaller folders. In contrast, U.S. newspapers generally contain a large number of pages, requiring more printing units, RTPs and larger folders.

Moreover, each large newspaper printing press is unique, requiring custom engineering to adapt the equipment to a customer's printing facility and to meet specialized performance characteristics. Such great diversity would preclude product matching even in a large market. In a small market, like the one for large newspaper printing presses, it makes matching impossible. With relatively few sales, it is, to the best of Petitioner' knowledge impossible to find two large newspaper presses sold in the United States and Japan that are sold at roughly the same time, are physically comparable, and differ in cost by less than 20 percent.

*See June 30, 1995 Petition for Imposition of Antidumping Duties, Vol. III, Information relating to Japan.* [7]

Notably Goss made these assertions without the benefit of discovery from the Defendants because it is not permitted during DOC proceedings. *See Poulenc, Inc. v. United States,* 899 F.2d 1185, 1189 (Fed. Cir.1990) (opposing parties are not entitled to conduct their own discovery during a DOC investigation). Instead, the parties are obliged to voluntarily respond to questionnaires. *See id.* Then, after reviewing the Defendants information provided to the DOC, presumably through voluntary questionnaires, Goss modified its original position concerning the possibility of conducting price to price comparison. Indeed, Goss argued on numerous instances that the DOC should conduct a price to price comparison. In a letter dated October 2, 1995, Goss asserted:

---

**6.** Because Goss does not base its allegations solely on the administrative findings of the DOC and the ITC, the TKS Defendants' argument that those findings fall outside the statute of limitations of the 1916 Act need not be addressed for purposes of their motion to dismiss. The Defendants are free however, to rebrief the issue at summary judgment or in a motion in limine if they see fit.

**7.** Similar accusations were made in Goss' petition to the DOC with regards to the German Defendants. *See June 30, 1995 Petition for Imposition of Antidumping Duties, Vol. II Information Relating to Germany.*

[P]reliminary information submitted by the Respondent suggests that there may be home market matches to U.S. sales.... Moreover, the price for the U.S. sale [deleted] suggest that it could be comparable to Japanese presses sold in the same fiscal year.

Oct. 2, 1995 Letter from C. Verrill to R. Brown, pp. 3–4. Likewise, Goss represented to the DOC that "[a]lthough Respondent asserts no such comparable sales exist, the information it does provide suggests at least the possibility of matches. In fact, the [deleted] units sold to [deleted], and thus the possibility of matches is extremely high." Oct. 5, 1995 Letter from C. Verrill to R. Brown. In a letter entitled "Large Newspaper Printing Presses, etc., From Japan: General Comments on Investigation Period and Model Match Issues" Goss writes:

> calculating dumping margins using home market sales, including the differences in merchandise adjustment is a fairly simply exercise. Therefore, in light of the statutory preference for home market prices as the basis for normal value, we urge the Department at this stage in the investigation not to preclude the use of home market prices.

Oct. 19, 1995 letter from C. Verrill to R. Brown. And again in an October 19, 1995 Letter to the Department, Goss represented "[t]he information contained in TKS's section A response strongly indicated that matching of [deleted] sold in the United States with comparable [deleted] sold in Japan is possible." Oct. 19, 1995 Letter from C. Verrill to R. Brown. Finally, in a letter dated October 26, 1995, Goss stated "Petitioner continues to believe that there is a strong probability that price-to-price comparisons are possible." Oct. 26, 1995, Letter from C. Verrill to R. Brown.

The fact that Goss did indeed represent to the DOC that price to price comparisons were possible seems apparent from the DOC's findings. In deciding to use constructed value, a cost-based analysis, as the basis for comparison, the DOC specifically noted that after Goss had an opportunity to review information provided by the Defendants Mitsubishi and TKS Japan, Goss argued price to price comparisons were appropriate. The Department specifically wrote:

> Petitioners, through counsel, then had an opportunity to comment materially on October 19, 1995. Petitioners have proposed several different matches between U.S. and home market sales for TKS and MHI which they now argue should be used for price-to-price comparison.

Mem. from DOC Investig. Team to R. Moreland, "Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Japan." No. A–588–837.

"The doctrine of judicial estoppel prohibits a party from taking inconsistent positions in the same or related litigation." *Hossaini v. Western Missouri Medical Center*, 140 F.3d 1140, 1142 (8th Cir.1998) (citing *Wyldes v. Hundley*, 69 F.3d 247, 251 n. 5 (8th Cir.1995)), *cert. denied*, 517 U.S. 1172, 116 S.Ct. 1578, 134 L.Ed.2d 676 (1996) (quoting *Morris v. California*, 966 F.2d 448, 452 (9th Cir.1991)). "The purpose of judicial estoppel is to protect the integrity of the judicial process." *Total Petroleum, Inc. v. Davis*, 822 F.2d 734, 737 n. 6 (8th Cir.1987); *see also Monterey Dev. Corp. v. Lawyer's Title Ins. Corp.*, 4 F.3d 605, 609 (8th Cir.1993) (noting judicial estoppel is " 'designed to preserve the dignity of the courts and insure order in judicial proceedings"). On one occasion, the Eighth Circuit characterized a party's attempt to take inconsistent positions in the same or related litigation as "tantamount to a

knowing misrepresentation to or even fraud on the court." *Total Petroleum, Inc.*, 822 F.2d at 737 n. 6. At the very least however, "judicial estoppel is limited to those instances in which a party takes a position that is clearly inconsistent with its earlier position." *Hossaini*, 140 F.3d at 1143 (citing *Linan–Faye Const. Co. v. Housing Auth. of Camden*, 49 F.3d 915, 933 (3d Cir.1995)).

Having thoroughly reviewed Goss' submissions to the DOC, this Court does not believe Goss' present position "is clearly inconsistent with its earlier position." *Hossaini*, 140 F.3d at 1143. To the contrary, it seems Goss never unequivocally foreclosed the idea of price to price comparison and, as the DOC recognized, its position simply developed over-time with the benefit of new information.[8] Moreover, four years have elapsed since the DOC's findings and presumably more sales have been undertaken. It is not inconceivable that with the benefit of discovery in the present case, Goss' chances of conducting a price to price comparison would greatly improve.

### C. Did Goss adequately allege that KBA Germany imported or assisted in importing newspaper printing presses in order to state a claim against KBA Germany under the 1916 Antidumping Act?

■ The Defendants argue that Goss has not alleged and cannot allege that KBA Germany imported or assisted in importing newspaper printing presses as required by the Act. Essentially, the Defendants argue that the German parent company "manufactures" large newspaper printing presses and sell them to their United States subsidiaries who then import them. This, the Defendants contend, is not importing or assisting with importing within the meaning of the Act.

Goss' complaint describes each of the foreign Defendants as a manufacturer of Newspaper Presses and Newspapers Press additions which "distributes these products" in the United States as well as other countries "through its affiliates and subsidiaries." *See Complaint*, ¶¶ 3 & 5. Goss further alleges that "[e]ach of the Defendants has imported or assisted in importing Newspaper Presses and News-

---

**8.** At oral argument, defense counsel instructed this Court that pleadings in trade law are quite distinct from those in other jurisdictions. One is not afforded the opportunity to modify its position over time, but rather, explained counsel, the complaint is the "main event." For this reason, defense counsel urged that Goss' representations in its original complaint carry significant weight and mere correspondence with the Department after the filing of the complaint cannot alter its original position.

Defendants' argument is duly noted but this Court is not inclined to carve out a trade law exception, as it were, to the judicial estoppel doctrine. As this Court sees the facts, Goss' original position before the DOC was that, "to the best of their knowledge," a price to price comparison would be impossible. As would be expected, their knowledge improved with the benefit of added information and Goss amended its earlier representations accord-

ingly. The DOC recognized Goss' revised position but declined to carry out a price to price comparison based on its belief that it was indeed impossible to do. This Court is not ruling that a price to price comparison is possible. On the contrary, a preliminary review of the facts seems to indicate Goss' ability to make a price to price comparison, assuming it is required by the 1916 Act, will be quite difficult. However, at the motion to dismiss stage, this Court's only duty is to determine whether Goss has adequately pled facts to support a claim under the 1916 Act and whether it is judicially estopped from alleging certain facts because of representations made in prior proceedings. The Court finds Goss has alleged adequate facts to state a claim under the 1916 Act and the representations it made to the DOC are not clearly inconsistent with those made to this Court and are therefore not barred under the doctrine to judicial estoppel.

paper Press components into the United States." *Complaint*, ¶¶ 38 and 39. The Defendants maintain that this is insufficient to state a claim because the 1916 Act was not intended to reach foreign manufacturers but instead to prevent dumping by foreign manufacturers by proscribing dumping by their U.S. importers.

The Act's interpretive case law underpins the notion that the 1916 Act was intended to reach foreign manufacturers. *See Schwimmer v. Sony Corp.*, 471 F.Supp. 793, 797 (E.D.N.Y.1979) (stating the 1916 Act was to protect United States industry "from the dumping of inexpensive products . . . by the older established European manufactures"); *Wheeling–Pittsburgh Steel Corp. v. Mitsui & Co.*, 35 F.Supp.2d 597, 604 (S.D.Ohio 1999) (purpose of the 1916 Act was to protect the country from "foreign trust, syndicates, and combinations" as well as "foreign companies owned or subsidized by foreign governments"); *Geneva Steel*, 980 F.Supp. at 1212 (1916 Act passed to remedy dumping by "European manufacturers").

Moreover, the 1916 Antidumping Act covers not simply importing but also assisting in importing. By arguing KBA Germany is essentially a manufacturer and an exporter and therefore not covered by the 1916 Act, the Defendants ignore the reality of its relationship with its subsidiary KBA NA. Defendant KBA Germany manufactures the presses, distributes them to its subsidiary, KBA NA, for the purpose of importing those presses to the United States. Indeed, according to the facts alleged in support of jurisdiction, Defendant KBA Germany is allegedly involved in the bidding process for its presses, and at the very least is aware of the pricing of its presses which are being sold in the U.S. market. It is this Court's belief that these facts are at least sufficient to allege "assisting in importing" goods into the United States within the meaning of the 1916 Act.

Accordingly, this Court finds Goss has sufficiently stated a claim against KBA Germany.

D. *Does this Court lack personal jurisdiction over KBA Germany and KBA NA in this forum, and is there proper venue as to these Defendants?*

Defendants KBA Germany and KBA NA argue that Goss cannot make out a *prima facie* case of personal jurisdiction and the case should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(2). Additionally, Defendants KBA Germany and KBA NA contend they do not reside in or have an agent in this district and therefore the action against them should be dismissed for improper venue pursuant to Federal Rule of Civil Procedure 12(b)(3).

When considering a jurisdictional challenge at the motion to dismiss stage, a district court has the authority to consider matters outside the pleadings. *See Drevlow v. Lutheran Church, Mo. Synod*, 991 F.2d 468, 470 (8th Cir.1993) (citing Federal Rule of Civil Procedure 12(b)(1)); *see also Southern Council of Indus. Workers v. Ford*, 83 F.3d 966, 968 (8th Cir.1996) (citing *Osborn v. United States*, 918 F.2d 724, 730 (8th Cir.1990)(stating "the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.")); and *Thompson v. Covington*, 47 F.3d 974, 975 (8th Cir.1995) (citing *Drevlow*, 991 F.2d at 470). In so doing, "the court must look at the facts in the light most favorable to the nonmoving party, . . ., and resolve all factual conflicts in favor of that party." *Dakota Industries v. Dakota Sportswear*, 946 F.2d 1384, 1387 (8th Cir.1991) (internal quotations omitted); *see also General Elec. Capital Corp. v. Grossman*, 991 F.2d 1376, 1387 (8th Cir.1993).

Accordingly, the Court will state the factual allegations as they relate to the issue of

personal jurisdiction and venue over the KBA Defendants, viewing those facts in the light most favorable to Goss.·

1. *Factual Allegations Underpinning Goss' Prima Facie Showing of Jurisdiction* [9]

a. *The KBA Defendants' Contacts with Iowa*

The KBA Defendants market their products in all 50 states. (Owen Dep. at 13, PX 4). Between 1995 and 1999 the KBA Defendants' contacts with the state of Iowa, specifically, include 672 documented personal days, 2,512 telephone calls, 59 exchanges of correspondence, and advertisements in multiple trade magazines published in the state of Iowa. (PX 76 (Plaintiff created chart of KBA Defendants' contacts with Iowa derived from PX's 4, 5, 14, 17, 22, 23, 26, 28, 29, 31, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 54, 62, 63, 64, 65, 66, 67, 69, 78, and 79)).

(i) *The Des Moines Register*

KBA Germany and KBA NA had contacts with Iowa from 1993 to 1997 in connection with a bid for a press to the Des Moines Register. KBA NA began soliciting the Des Moines Register as a prospective customer in 1993. (Ryan Dep. at 8, PX 5). KBA Germany intended to manufacture the major components of the proposed press. (PX 13). KBA Germany also was heavily involved in the bid and bidding process, providing determinations of the press specifications, scheduling, and pricing decisions. (Owen Dep. at 137, PX 4; PXs 6, 7–12).

Scott Smith, KBA NA's president, wrote a letter to KBA NA's CFO, Gerrit Zwergel, dated December 19, 1996, stating that Zwergel and KBA Germany's President

and CEO, Reinhart Siewert, would "have to sign off on this price level." (PX 1). The price level Smith was referring to was identified as a "special price" of $30,250,000. (PX 1). In his request for price approval from Germany, Smith stated:

Gerrit: You and Mr. Siewert have to sign off on this price level. I don't believe KBA–Motter is capable of achieving our *cost of sales* (fully absorbed mfg./purchasing/eng. costs) given the Des Moines complete bill of material & a price of $30,250,000. This order will require financial backing of Wurzeburg.

(PX 1 (emphasis in the original)). Smith also noted that MAN had previously sold "the same equipment" for $36,000,000, which was almost $6,000,000 more than KBA NA's bid to the Des Moines Register, and that the DOC/ITC found that the MAN price was "at or below cost". (PX 1).

In March of 1997, KBA NA submitted the price of $30,250,000 to the Des Moines Register. This bid was approved by Siewert, KBA Germany's President and CEO and signed by Zwergel. (Smith Dep. at 145–46, PX 14).

The proposed press was to be manufactured and installed by both KBA Germany and KBA NA. (PXs 6 and 13). KBA NA's correspondence to the Des Moines Register emphasized that "the team that is assembled here in York and in Wuerzburg will provide the knowledge and skill level to guarantee a successful project." (PX 16). KBA NA's proposal for the Des Moines contract anticipated that KBA Germany would send German employees to Iowa to install the press, and that KBA Germany and KBA NA technicians would

---

**9.** Goss' Appendix of exhibits will hereinafter be referred to as "PX" and the number of the exhibit. The KBA Defendants' exhibits will hereinafter be referred to as "DX" and the number of the exhibit.

be on site continually for six months during the installation. (Ryan Dep. at 37, PX 5)

The bidding on the Des Moines press was prescribed by KBA Germany. Upon receiving the initial Request for Proposal from Des Moines, KBA NA sent it to KBA Germany. (PX 18). KBA Germany personnel determined and prepared the specifications, press configurations, scheduling, and cost and pricing information to be used in the bid, and sent that information to KBA NA. (PXs 7–12; PX 19; Owen Dep. at 137–38, PX 4; Smith Dep. at 68, 129–30, PX 14). KBA NA simply reformatted the information to fit the customer's formatting requirements, and submitted it to the customer. (Owen Dep. at 136, PX 4). This same process was repeated several times between September 1996 and March 1997, as KBA Germany prepared and forwarded to the United States several revised bid proposals. (PXs 7–12).

At least one price quote was sent directly from KBA Germany to the Des Moines Register. (PX 20). Other prices, including the final "walkaway price" as of February 1997, were sent from KBA Germany to KBA NA in Pennsylvania. (PX 11).

On March 11, 1997, the parties attended a final bid meeting at Gannet's headquarters in Arlington, Virginia. (Ryan Dep. at 18, PX 5). KBA Germany's Vice President of Engineering and Technology, Claus Bolza–Schunemann, traveled from Germany to attend the meeting and was an "active participant," particularly on pricing issues. (Ryan Dep. at 18–20, PX 5). After that meeting, KBA NA asked Bolza–Schunemann and Heinz Schmid of KBA Germany to help "reinforce our position at Gannett." (PX 21).

*Travel to Des Moines:* KBA NA salesman Richard Hirst initially visited the Des Moines Register in 1993, when he met with Austin Ryan, the Register's Vice President of Production. (Ryan Dep. at 8, PX 5).

Hirst continued to make sales calls to Ryan in Des Moines several times a year between 1993 and 1995. (Ryan Dep. at 49, PX 5; PX 22).

After receiving the Request For Proposal from Des Moines in August 1996, KBA NA personnel traveled to Des Moines to discuss the proposal. (PXs 22, 23). On September 10, 1996, KBA NA salesmen Gary Owen and Hirst traveled to Des Moines to meet with Ryan. (PX 23; Ryan Dep. at 48–49, PX 5). On October 8, 1996, Owen, Hirst and Schmid of KBA Germany also met with Ryan in Des Moines. (PXs 22, 23; Ryan Dep. at 55–56, PX 5). In February 1997, KBA NA representatives again met with Ryan. (Ryan Dep. at 36, PX 5).

*Correspondence With Des Moines:* The KBA Defendants sent "numerous pieces" of marketing material to Ryan in Des Moines before the contract discussions began. (Ryan Dep. at 40–41, PX 5). Throughout the proposal period, KBA NA sent nearly thirty letters, faxes, and other materials to the Des Moines Register. (PXs 24 and 25).

*Telephone Contacts With Des Moines:* In connection with the bid, KBA NA made hundreds of telephone calls to Des Moines. Austin Ryan received phone calls from Schmid "numerous times." (Ryan Dep. at 11–12, PX 5). Between 1995 and 1999, 584 telephone calls were made to Des Moines from KBA NA. (PXs 76 and 79).

(ii).  *Sales to and Dealings With Lee Enterprises in Davenport, Iowa.*

Lee Enterprises, Inc. is headquartered in Davenport, Iowa. (Declarations of Ronald Rickman ¶ 2 ("Rickman Decl."), PX 26). It owns approximately 19 newspapers and 100 other printing facilities throughout the United States. (Rickman Decl. ¶ 2, PX 26). Ronald Rickman was Lee Enterprises' President of Newspapers from 1986 through 1999. (Rickman Decl. ¶¶ 3–4, PX

26). From his office in Davenport, Rickman was responsible for all of Lee Enterprises' major equipment purchases. (Rickman Decl. ¶¶ 3–4, PX 26).

In 1992 or 1993, KBA Germany and NA representatives contacted Rickman in Davenport and expressed interest in doing business with Lee Enterprises. (Rickman Decl. ¶ 6, PX 26). The KBA Defendants continued to solicit Lee Enterprises on a regular basis thereafter, sending Rickman brochures, updates on technology, and samples on a monthly basis. (Rickman Dec. ¶ 6, PX 26). Specifically, Reinhard Siewert, Hans Bolza–Schunemann, Scott Smith and Gary Owen visited Lee Enterprises' headquarters in Davenport Iowa to discuss the sale and purchase of KBA presses. (Rickman Dec. ¶ 8, PX 26). Between 1993 and 1997, the KBA Defendants sold three major presses to Lee Enterprises and they continue to this day to do business with Lee Enterprises in Iowa. (Rickman Dec. ¶¶ 7–10, PX 26).

*The Racine and Decatur Press Sales, 1993–1995:* In 1993, KBA Germany and NA bid on and won an $8.3 million contract to sell two Colormax flexographic newspaper printing presses to Lee Enterprises. (Smith Dep. at 97, PX 14; PX 27). Although the presses were for Lee's newspapers in Decatur, Illinois and Racine, Wisconsin, there were extensive contacts relating to the solicitation, bidding, negotiation, contracting, and sale conducted through Lee Enterprises' headquarters in Iowa, and the contract was signed by Lee Enterprises in Iowa. (Rickman Decl. ¶¶ 7–10, PX 26; PX 27).

Representatives of both KBA Germany and KBA NA traveled to Iowa on different occasions to negotiate and consummate this transaction. (Rickman Decl. ¶ 8, PX 26; Owen Dep. at 80–81, PX 4). Shortly before the contract was signed, KBA NA's President, Scott Smith, and two of its salesmen, Gary Owen and Richard Hirst,

met with Ron Rickman in Davenport to discuss pricing and to compile a "final understanding" of what Lee Enterprises wanted. (Owen Dep. 52–54, PX 4). On November 2 and 3, 1993, KBA Germany's then-President, Hans Bolza–Schunemann, and his successor, Reinhart Siewert, traveled from Germany to meet with several representatives of Lee Enterprises in Iowa to discuss the sale. (Rickman Decl. ¶ 8, PX 26). KBA NA's President, Smith, and its salesman, Owen, attended that same day two-day meeting. (Rickman Decl. ¶ 8, PX 26). Owen met with Rickman in Davenport on additional occasions as well. (Owen Dep. at 80–81, PX 4; PX 28).

The KBA Defendants also engaged in continuing discussions and correspondence with Lee Enterprises in Iowa regarding these press sales. KBA NA transmitted letters, faxes, e-mails, and telephone calls into Iowa. (Smith Dep. at 108, PX 14; Owen Dep. at 57–58, PX 4; PX 29). Between October 1993 and December 1994, KBA NA and Lee Enterprises negotiated at least five addenda to the original contract. (Rickman Decl. at ¶ 10, PX 26; PX 20). After the presses were installed in 1995, Owen and Smith sent letters to Lee Enterprises in Iowa regarding these and other projects. (PX 31). These contacts spanned at least five years from 1993 through 1998. (PXs 29 and 31).

Although the contract for the Decatur and Racine presses named KBA NA as the seller, KBA Germany's most senior officers from Germany were directly involved in the sale. For example, on June 14, 1993, KBA Germany's then-President, Hans Bolza–Schunemann, together with KBA NA's general manager and a salesman, met in New Orleans with Rickman of Lee Enterprises to discuss the contract. (Rickman Decl. ¶ 8, PX 26; Ex. C). Bolza–Schunemann also attended the two-day

meeting in Iowa on November 2 and 3, 1993. (Rickman Decl. ¶ 8, PX 26).

*Iowa Globe Gazette Sale in Mason City, Iowa, 1994–Present:* KBA NA has had ongoing contacts with Iowa for more than five years, and continuing to this day, in connection with the sale of a $1.3 million press to Lee Enterprises for the Mason City Press. (PX 32). The original contract for the Mason City Press was dated March 29, 1995, and followed "extensive negotiations" between the parties. (Rickman Decl. at ¶ 11, PX 26; PX 32). Over the five-plus years since the contract was signed, KBA NA representatives have traveled to Iowa dozens of times, have had hundreds of telephone contacts, and have exchanged scores of correspondence and other communications with this state. (PX 76).

CEO, Scott Smith, traveled to Mason City to meet with the customer. (Query Dep. at 18–19, PX 52). Pav and Dunleavy returned to Mason City in October 1995. (PXs 33 and 34). On March 14, 1996, KBA NA's salesman, Richard Hirst, traveled to Mason City. (PX 36). On May 1 and 2, 1996, Pav returned to Mason City accompanied by Terry Holtzinger. (PXs 34 and 37). Holtzinger returned to Mason City in June of 1996. (PX 37).In the period between the signing of the contract in May 1995 and the press installation, which began in January 1997, KBA NA's personnel traveled to Mason City, Iowa seven times to inspect the site and discuss scheduling and other issues. KBA NA's engineer Michael Dunleavy, along with KBA NA's Executive Director of Engineering Darrel Pav and KBA NA's Engineer Wayne Hall, traveled to Mason city on May 3 and 4, 1995, for site inspections and meeting with the customer. (PXs 33–35). Dunleavy, Hall and Pav returned to Mason City in June, July, and August 1995, to discuss the site inspections and the timeline for the project. (Query Dep. at 14–16, PX 52; PXs 33–35). In August or September 1995, KBA NA's President and Installation of the Mason City Press began in January 1997 and lasted approximately six to eight months. (Query Dep. at 23 and 27, PX 52). On December 18–20, 1996, Corwin Shearer traveled to Mason City for pre-installation meetings. (PX 39). Throughout the installation period, from January 1997 through August of that year, fourteen different employees of KBA NA were in Mason City at some point helping with the installations. (Query Dep. at 23, 28–29, PX 52; PXs 38–51). Doug Setzer of KBA NA was in Mason City "for the duration of the entire install" from January until August 1997. (Query Dep. at 29, PX 52; PXs 53 and 38). Richard Hirst visited Mason City in February 1997, and again in August 1997. (PX 36). Jan Lindstrom, who worked for KBA Germany and KBA NA at different times, was in Mason City "off and on" for two to three weeks during the installation. (Query Dep. at 29–30, PX 52).

Even after the installation was complete, KBA NA personnel frequently visited Mason City to work on warranty and service issues. Doug Setzer was "in and out" of Mason City on a regular basis from July 1997 through June 1998. (Query Dep. at 36, PX 52, PX 53). In fact, Setzer continued traveling to Mason City throughout 1998, visiting in August, September, and December 1998. (PX 38). In October and November 1997, seven different installers were in Mason City doing such work. (PXs 38, 39, 43, 44, 46, 48, and 51). Ray Foulkes and Jan Lindstrom traveled to Mason City with James McSweeney in May 1998. (PXs 45, 47, and 49). Howard Query recalled meeting with Foulkes three or four times; all but one of these meetings took place in Mason City. (Query Dep. at 56, PX 52). Three other KBA NA personnel traveled to Mason City with Setzer on each of his 1998 trips. (PXs. 41, 44 and 45). Since 1998, KBA NA personnel

have been in Mason City five to seven times for service purposes, with each visit lasting one or two days. (Smith Dep. at 18, PX 14). Even today, KBA NA personnel continue to travel to Mason City for service visits. (Smith Dep. at 18, PX 14).

Since the installation of the Mason City Press, KBA NA has continued to solicit sales. For example, Howard Query met with KBA NA salesman Owen between five and ten times, most recently in 1998 at a NEXPO convention. (Query Dep. at 19—20, PX 52). KBA NA has continued to make sales of spare parts to Mason City on an ongoing basis. (Query Dep. at 49, PX 52). KBA NA has shipped spare parts to Mason City since the press' installation. When asked to approximate the total value of these parts, Smith stated these parts have "not exceeded $10,000" in value since 1998. (Smith Dep. at 19–20 [10], PX 14; Rickman Decl. at ¶ 12, PX 26).

KBA NA also exchanged at least eighteen pieces of correspondence with Iowa regarding the Mason City press, from November 1994 through December 1998. (Query Dep. at 72–73, PX 52; PX 54). Mason City and KBA NA were in "very frequent" telephone contact. (Query Dep. at 73, PX 52). During the installation process, phone calls between KBA NA and Mason City occurred several times a day, on a daily basis. (Query Dep. at 73, PX 52). Howard Query has received phone calls from KBA NA personnel as recently as 1998 and 1999. (Query at 98–99, PX 52). Between 1995 and 1999, 1502 phone calls were made to Mason City. (PXs 76, 78, and 79). In 1997 alone, 1,377 calls were made. (PXs 76, 78, and 79).

*The Lincoln Journal Star Bid, 1995–97:* KBA Germany and KBA NA also worked for a period of more than two and one-half years from March 1995 through November 1997, to sell a large newspaper press to Lee Enterprises for its paper in Lincoln, Nebraska. (PX 55). KBA Germany and KBA NA submitted proposals to Lee Enterprises for two alternative presses—a $10.3 million proposal from KBA for a German-made "KBA Cobra" offset press (PX 56), and a $12.4 million proposal for a "KBA Colormax" flexo press, which both KBA Defendants contend would have been manufactured in Pennsylvania. (PXs 57 and 58).

Although the bulk of the discussions regarding these proposals were apparently conducted with Lee Enterprises' personnel in Lincoln, Nebraska, discussions and correspondence also took place on several occasions with Lee Enterprises' representatives in Davenport, Iowa, including Ron Rickman, who "was ultimately responsible for all major equipment acquisitions." (Rickman Decl. ¶¶ 4 and 13, PX 26; PX 60). It was also clear that the ultimate decision on the selection of a press vendor was made at Lee Enterprises' home office in Davenport, and that KBA NA would have contracted with Lee's home office had they won this sale, as they did with all other Lee Enterprises contracts. (PX 61).

*Soliciting Lee Enterprises for Additional Equipment Sales:* In April 1998, KBA NA had discussions with and prepared a proposal for Lee Enterprises to supply additional press components for the Mason City Press. (PX 77). KBA NA has also had discussions since 1998 with a Lee Enterprises' representative about adding additional equipment to the Decatur and Racine presses. (Owen Dep. at 61–68, PX 4).

(iii) *Other Contacts With Iowa*

*Solicitation of the Cedar Rapids Gazette— 1996–97:* KBA Germany and KBA NA

---

**10.** In his declaration, Smith states the parts cost $900 in 1998 and $1,800 in 1999. (Smith Decl. at ¶ 6, DX 9).

also had contacts with Iowa in 1996 and 1997, when they solicited the Cedar Rapids Gazette (the "Gazette") for the sale of a new printing press. Richard Hirst, who called on the Gazette, did so on behalf of both KBA Germany and KBA NA, using a business card that listed both companies. (Happ. Dep. at 9 and 32, PX 62; Murphy Dep. at 16, PX 63). Tom Happ, the production administrator at the Gazette, believed that Hirst was dealing on behalf of KBA Germany. (Happ Dep. at 14, 27, PX 62).

Hirst visited Cedar Rapids to call on the Gazette five or six times over an 18 month period beginning in 1996. (Happ Dep. at 10–11, 14, PX 62). Specifically, Hirst visited Cedar Rapids on March 15, April 4, August 22, and November 14, 1996. (PX 64). He returned to Cedar Rapids on August 21, 1997 to "find out what Cedar Rapids Gazette purchased" after KBA was not awarded the contract. (PX 64).

Hirst also telephoned the Gazette on numerous occasions for status reports and to arrange visits to Cedar Rapids. (Happ Dep. at 18–19, PX 62). These calls occurred every two or three months throughout 1996 and 1997. (Hap Dep. at 18, PX 62). According to KBA NA's records, 130 phone calls were placed to Cedar Rapids between 1996 and 1999. (PXs 76, 78, and 79).

*KBA's Sale to Rock–Tenn in Clinton, Iowa, 1998–99:* In 1998, a KBA Rapida ("Rapida") printing press was installed in Clinton, Iowa. The Rock–Tenn Company purchased the press for its Clinton, Iowa plant from KBA Germany and KBA NA Sheetfed Division in November 1998. (PX 65). KBA NA Sheetfed is a wholly owned subsidiary of KBA. It has no manufacturing facilities of its own, and sells only KBA German-made presses. (Fischer Dep at 57–58, PX 66).

*KBA and KBA NA's advertisements in Iowa:* KBA Germany and KBA NA have advertised their products in Iowa for the last five years. (PXs 68, 69; Smith Dep. 122–24, PX 14). The advertisements have run in various trade publications, all of which circulate in Iowa. The following publications contain advertisements from KBA Defendants: Newspapers and Technologies (319 Iowa Circulation); Presstime (262 Iowa Circulation); TechNews (167 Iowa Circulation); and Editor and Publisher (276 Iowa Circulation). Various customers testified to seeing KBA Defendants' advertisements in these publications, which they received in Iowa. (Ryan Dep. at 70, 71, PX 5; Query Dep. 79–80, PX 52; Happ. Dep. at 26, PX 62; Murphy Dep. at 20, PX 63).

*Contacts with Iowa through the KBA Defendants Website:* The KBA Defendants operate an interactive website which is continuously accessible in the United States and in Iowa. (PX 70, *www.kba-print.de* ). The website can be viewed in both German and English. (PX 70). Visitors to the site can access information about all of KBA's products; view the KBA organizational chart and investment information; order product brochures, the customer magazine "KBA Report" and CD–ROMs; directly contact individuals in various KBA departments in Germany, as well as KBA NA personnel, through hyperlinks to the individuals' email addresses; download investment reports such as quarterly and annual reports; link to other related companies, including KBA NA; and submit personal contact information to KBA. (PX 70).

KBA maintains this interactive website specifically for the purpose of marketing and advertising its products. (Fischer Dep. at 14, PX 66). KBA's policy is to respond to every request for information that it receives from its website. (Fischer Dep. at 39–41, PX 66). The company re-

ceived at least one request from Iowa and responded to that request. (PX 71).

b. *KBA Germany and KBA NA*

KBA Germany and KBA NA share some of the same employees and directors. KBA NA officers previously worked for KBA Germany (Fischer Dep. at 61–62, PX 66), and a current KBA NA engineer, Fred Dressier, is a liaison to Germany (Owen Dep. at 140–41, PX 4). Jan Lindstrom recently transferred from KBA Germany to KBA NA. (Query Dep. at 29–30, PX 52). "Koenig & Bauer AG" appears on the business cards distributed by KBA NA employees, including salesman Richard Hirst. (Happ Dep. at 32, PX 62). The advertisements run by the two companies promote "Koenig & Bauer Group" and list both KBA Germany and the KBA NA "Division." (PX 68; Query Dep. at 113, PX 52).

Heinz Schmid uses KBA Germany letterhead although he is said to be an employee of KBA NA and he sends faxes on KBA letterhead from Germany, and provides a German phone number as his contact information. (PX 72; Ryan Dep. at 13,1 4, and 16, PX 5). Reinhart Siewert, President of KBA Germany, and Claus Bolza-Schunemann, KBA Germany's Vice President of Engineering and Technology, sit on the boards of both KBA NA and KBA. The former President of KBA Germany, Hans Bolza–Schunemann, also sat on the boards of both KBA NA and KBA Germany. (Smith Dep. at 72–74, PX 14).

Many of KBA NA and KBA Germany's Iowa customers believed that "KBA" is one company. Ron Rickman, the President of Newspapers at Lee Enterprises, states that throughout his relationship with KBA, "I understood KBA or Koenig & Bauer to be a single entity. I was never advised that Koenig & Bauer AG and KBA North America, Inc. (together, "KBA") were separate companies." (Rickman Decl. ¶ 5, PX 26). Austin Ryan, Vice Pres-

ident of the Des Moines Register, testified that, "In all my dealings, I've never recognized them as separate companies" (Ryan Dep. at 10, PX 5) and, "when I say, 'KBA,' it's the company, whether it's the German or the U.S. arm." (Ryan Dep. at 13, PX 5). Howard Query, Publisher of Iowa Globe–Gazette, likewise failed to see a difference between the two companies. (Query Dep. at 112, PX 52).

c. *KBA Germany's Contacts with the United States*

KBA Germany manufactures printing presses and components which it sells, ships, and installs throughout the North American market, including all 50 states. (Owen Dep. a 13, PX 4; Smith Dep. at 38–51, PX 14). During the 1990s alone, KBA Germany bid on or sold more than 25 major presses in this country. (PX 73). KBA Germany also appears regularly at trade shows and newspaper conventions throughout the United States, such as the annual NEXPO convention. (Query Dep. at 75–76, PX 52).

2. *Goss' Prima Facie Showing of Personal Jurisdiction*

As the Plaintiff, Goss bears the ultimate burden of proof on the issue of personal jurisdiction. *See Dakota Industries*, 946 F.2d at 1387. However, "jurisdiction need not be proved by a preponderance of the evidence until trial or until the court holds an evidentiary hearing." *Id.* (citing *CutCo Ind. v. Naughton*, 806 F.2d 361, 365 (2d Cir.1986)). To defeat a challenge to personal jurisdiction at the motion to dismiss stage, Goss need only make a prima facie showing of jurisdiction. *See id.* (citing *Watlow Elec. Mfg. v. Patch Rubber Co.*, 838 F.2d 999, 1000 (8th Cir.1988)); *Falkirk Min. Co. v. Japan Steel Works, Ltd.*, 906 F.2d 369, 373 (8th Cir.1990).

"The determination whether a court has personal jurisdiction over a nonresident defendant involves 'a two-step analysis.'" *Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas, S.A,* 51 F.3d 1383, 1386–87 (8th Cir.1995) (citing *Wines v. Lake Havasu Boat Mfg., Inc.,* 846 F.2d 40, 42 (8th Cir.1988)). First, a court must look to the applicable state long-arm statute or jurisdictional rule, in this case, Iowa Rule of Civil Procedure 56.2. *See Wines,* 846 F.2d at 42. Second, the court's exercise of jurisdiction must be consistent with the due process clause of the Fourteenth Amendment. *See id.* When a state construes its long-arm statute or rule to confer jurisdiction to the fullest extent permitted by the due process clause, as is the case here, *see Larsen v. Scholl,* 296 N.W.2d 785, 788 (1980) (stating the state's rule "expands Iowa's jurisdictional reach to the widest due process parameters of the federal constitution"), the inquiry collapses into the single question of whether exercise of personal jurisdiction comports with due process. *See Northrup,* 51 F.3d at 1387; *see also Land–O–Nod v. Bassett Furniture Indus.,* 708 F.2d 1338, 1340 (8th Cir.1983).

"Due process requires that the defendant 'have certain minimum contacts' with the forum state such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Clune v. Alimak,* 233 F.3d 538, 541–42 (8th Cir.2000) (quoting *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)); *see also Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1941). In some limited circumstances, a court may exercise its jurisdiction over a *foreign* defendant based on its minimum contacts with the *United States* as a whole as opposed to simply the forum state. *See In re Federal Fountain, Inc.,* 165 F.3d 600, 601–02 (8th Cir.1999) (en banc).

In the instant action Goss maintains the Defendants' minimum contacts with the United States, as well as Iowa, are sufficient for the Court to exercise jurisdiction over them.

a. *The Defendants' Minimum Contacts With the United States*

■ Goss avers this Court can exercise personal jurisdiction over both KBA Defendants because where, as here, the cause of action arises under a federal statute, jurisdiction can be based upon a defendant's aggregate contacts with the United States. Whether the Court can exercise personal jurisdiction over a foreign defendant based on their national contacts is governed by Federal Rule of Civil Procedure 4(k). Rule 4(k), entitled Territorial Limits of Effective Service, as amended December 1, 1993, provides, in relevant part:

(1) Service of a summons or filing a waiver of service is effective to establish jurisdiction over the person of a defendant

(A) who could be subjected to the jurisdiction of a court of general jurisdiction in the state in which the district court is located, or

. . . . .

(D) when authorized by a statute of the United States.

(2) If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

Accordingly, Rule 4(k) grants a district court the statutory power to exercise juris-

diction over a foreign defendant when authorized by federal statute, or where foreign defendants, party to a suit pursuant to federal law, are not subject to personal jurisdiction in any state. *See Central States, Southeast and Southwest Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 942–43 (7th Cir.2000); *CFMT, Inc. et al. v. Steag Microtech, Inc.*, 965 F.Supp. 561, 565 (D.Del.1997); *Berthold Types Ltd. v. European Mikrograf Corp.*, 102 F.Supp.2d 928 (N.D.Ill.2000); *Kohler Co. v. Titon Indus. Inc.*, 948 F.Supp. 815, 820 (E.D.Wis.1996).

Contrary to Goss' assertions, neither criteria is met in this case. The present suit is brought pursuant to the 1916 Act which makes no mention of service of process. Thus provision (1)(D) of Rule 4(k) allowing for jurisdiction "when authorized by a statute of the United States" is not met.

Goss attempts to avoid this outcome by citing legal authority prior to the 1993 Amendments to Rule 4(k) which stands for the proposition that due process is not offended by the exercise of jurisdiction over foreign defendants where those defendants possess sufficient contact with the United States. *See e.g. United Rope Distrib. Inc. v. Seatriumph Marine Corp.*, 930 F.2d 532, 534 (7th Cir.1991); *Fitzsimmons v. Barton*, 589 F.2d 330, 333 (7th Cir.1979); *Handley v. Indiana & Michigan Elec. Co.*, 732 F.2d 1265, 1271 (6th Cir.1984); and *DeJames v. Magnificence Carriers Inc.*, 654 F.2d 280, 292 (3d Cir.), *cert denied,* 454 U.S. 1085, 102 S.Ct. 642, 70 L.Ed.2d 620 (1981). Because those cases precede the revisions to Rule 4(k) they do not take into account the explicit language of section (1)(D) which clearly requires that service of process be mandated by federal statute in order for the national contacts test to suffice for purposes of due process. *See* Fed.R.Civ.P. 4(k)(1)(D).

Goss' legally unsubstantiated contention that this section of the rule is satisfied by service of process pursuant to Rule 4(f) is equally without merit. Rule 4(f) authorizes service of process "by any internationally agreed means reasonably calculated to give notice, such as those means authorized by the Hague Convention." Contrary to Goss' contention, Rule 4(f) is concerned only with mechanics of service. The amenability to service allowing for jurisdictional basis is separately governed by subdivision (k). *See CFMT,* 965 F.Supp. at 563; This is further evinced by the committee's stated purpose of the 1993 revision:

The revised rule explicitly authorizes a means for service of the summons and complaint on any defendant. While the methods of service so authorized always provide appropriate notice to persons against whom claims are made, effective service under this rule does not assure that personal jurisdiction has been established over the defendant served.

Advisory Committee Notes, 1993 Amendments, Purpose of the Revision.

Moreover, as noted by the *CMFT* court, an assertion that Rule 4(f) renders a foreign defendant amenable to service worldwide is incongruous with subdivision (k)(2), which was added by the 1993 Amendments. As indicated previously, Rule 4(k)(2) provides that service of summons confers personal jurisdiction for federal claims over only those Defendants who are not subject to personal jurisdiction in any state. This provision was designed to allow a court to exercise jurisdiction over a defendant located in a foreign country. If, as [the plaintiff] assert[s], Rule 4(f) authorizes worldwide service over foreign Defendants, the limitation on the jurisdictional reach of a district court over foreign Defendants set forth in Rule 4(k)(2) would be meaningless.

It is uncontested that the 1916 Act does not provide for nationwide or worldwide

service of process and therefore cannot be a basis for jurisdiction under Rule 4(k)(1)(D).

Likewise, the Court cannot exercise its jurisdiction over the KBA Defendants under the auspices of section 2 of Rule 4(k) because the Defendants are subject to the jurisdiction of other district courts. Goss alleges that were this Court not to exercise jurisdiction over the KBA Defendants, no other district court will have a "greater reason" to exercise jurisdiction and the KBA Defendants will be able to avoid federal jurisdiction all together, even though they are clearly doing business within the United States. Goss' "greater reason" falls short of the rule's explicit requirement that Goss show the KBA Defendants are out of the jurisdictional reach of any district court in the country. Goss' argument seems particularly disingenuous when it fails to address as an initial matter the fact that KBA NA is incorporated and its place of business is in Pennsylvania, obviously opening it up to the jurisdiction of Pennsylvania's courts.

Absent the mandate of a federal statute stipulating means of service, or a sufficient showing that the KBA Defendants are beyond the jurisdictional reach of any court in this country as required by Rule 4(k)(2), this Court rejects Goss' argument that jurisdiction can be exercised over these Defendants based on their national contacts.

b. *The Defendants Minimum Contacts With the Forum State*

Alternatively, Goss contends that these Defendants' contacts with Iowa are sufficient to support the jurisdiction of this Court. A defendant's minimum contacts with the forum state must be such that they "should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). 'Minimum contacts' has been con-

strued by the Supreme Court to mean "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)). Courts carry out "a five-factor test—the first three factors being of primary importance—to determine the sufficiency of defendant's contacts." *Burlington Industries v. Maples Industries,* 97 F.3d 1100, 1102 (8th Cir.1996). They include: "(1) the nature and quality of contacts with the forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) convenience of the parties." *Id.* (citing *Land–O–Nod,* 708 F.2d at 1340; *Gould v. P.T. Krakatau Steel,* 957 F.2d 573, 576 (8th Cir.) (en banc) *cert denied,* 506 U.S. 908, 113 S.Ct. 304, 121 L.Ed.2d 227 (1992); *Northrup,* 51 F.3d at 1388; *Aftanase v. Economy Baler Co.,* 343 F.2d 187, 197 (8th Cir.1965)). The Supreme Court elaborated further on the third factor—the relationship of the cause of action to the contacts—distinguishing between specific jurisdiction, where the claim against the defendant arises out of or is related to the defendant's contacts with the forum state, and general jurisdiction, when there are sufficient contacts between the forum State and the defendant. *See Bell Paper Box, Inc. v. U.S. Kids, Inc.,* 22 F.3d 816, 819 (8th Cir.1994) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 nn. 8–9, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)).

In support of its jurisdictional argument Goss merges the actions of the two companies together on the premise that the companies function as one and this Court can

accordingly exercise jurisdiction over both. Thus, prior to carrying out the five factor test, this Court must first address whether KBA NA's actions as a subsidiary of KBA Germany, can be imputed on KBA Germany allowing this Court to exercise jurisdiction over both.

(i.) *Attribution of KBA NA's contacts to KBA Germany*

■ Personal jurisdiction over a nonresident corporation can be based on the activities of its subsidiary where the parent so controlled and dominated the affairs of the subsidiary that the latter's corporate existence was disregarded. *See Lakota Girl Scout Council, Inc. v. Havey Fund–Raising Management, Inc.,* 519 F.2d 634, 637 (8th Cir.1975); *Contractors, Laborers, Teamsters & Engineers Health Plan v. Hroch,* 757 F.2d 184, 190 (8th Cir.1985); *Scott v. Mego International, Inc.,* 519 F.Supp. 1118, 1126 (D.Minn.1981). As explained by the Eighth Circuit,

A corporation is not doing business in a state merely by the presence of its wholly owned subsidiary. *Cannon Manufacturing Co. v. Cudahy Packing Co.* 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925). However, the fiction of corporate entity may be disregarded, where one corporation is so organized and controlled and its affairs are so conducted that it is, in fact, a mere instrumentality or adjunct of another corporation.

*Lakota Girl Scout Council,* 519 F.2d at 637; (citing *Frazier v. Alabama Motor Club, Inc.,* 349 F.2d 456, 459 (5th Cir. 1965); *Industrial Research Corp. v. General Motors Corp.,* 29 F.2d 623, 625 (N.D.Ohio, 1928); *see also Karlin v. Avis,* 326 F.Supp. 1325 (E.D.N.Y.1971) (piercing the corporate veil, if only to establish jurisdiction over parent corporation, is a drastic approach authorized only in the most extreme situations)).

In view of these principles, a court's assertion of jurisdiction is contingent on the ability of the plaintiffs to pierce the corporate veil. *See Lakota Girl Scout Council,* 519 F.2d at 638. The Eighth Circuit has approved the following set of factors as proper guidance for this inquiry: "(1) the corporation is undercapitalized, (2) without separate books, (3) its finances are not kept separate from individual finances, individual obligations are paid by the corporation, (4) the corporation is used to promote fraud or illegality, (5) corporate formalities are not followed or (6) the corporation is merely a sham." *Id.; see Hroch,* 757 F.2d at 190.

Goss asserts that attribution is appropriate in this case because: (1) KBA Germany "interchanges its personnel with KBA NA" (2) KBA Germany prepares all bids for KBA NA; (3) that the companies represent themselves as a "seamless" entity; (4) KBA Germany "assumes financial support for KBA NA"; and (5) KBA Germany "trains KBA NA personnel on the use of KBA's technology." *Goss Response Brief,* at 34.

First, the Defendants take issue with Goss' characterization of the facts. This Court however, must view the facts in the light most favorable to the plaintiff at this stage and draw all reasonable inferences from those facts in their favor. *See Dakota Industries,* 946 F.2d at 1387. That said, the Defendants contend that these allegations are insufficient to impute KBA NA's actions on KBA Germany. This Court agrees.

Even viewing the facts in the light most favorable to Goss, its seems clear that KBA Germany is not involved in the day to day affairs of KBA NA. Although the majority of KBA NA's directors also serve on the board of KBA Germany, there are no overlapping officers and the companies do not share employees. KBA NA's officers,

not KBA Germany's, make their own decisions with regards to the company's business goals, annual budget, and the products it manufactures, and KBA NA also raises its own capital. Goss does not allege that the companies failed to maintain separate books and records, that the companies commingled assets, or otherwise failed to comply with corporate formalities. Accordingly, this Court finds there is no basis to impute the actions of KBA NA to KBA Germany for purposes of jurisdiction. *See LaSalle Nat'l Bank v. Vitro*, 85 F.Supp.2d 857, 866 & n. 9 (N.D.Ill.2000) (refusing to impute subsidiary's contacts to parent where there was "no evidence here that [the parent] took active, day-to-day control over any subsidiaries" even though there was a "significant overlap" of the directors and officers of the company); *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1160 (1983) (finding parent did not dominate and control subsidiary for jurisdictional purposes even though parent had complete authority over general police decisions of subsidiary and supped raw materials to be used to manufacture the subsidiary's products, because the subsidiary's officers, not the parent's made "day-to-day business and operational decisions."); *Northeastern Power Co. v. Balcke–Durr, Inc.*, 49 F.Supp.2d 783, 785, 788 (E.D.Pa. 1999) ("finding German parent was not alter ego of its subsidiary such as to permit imputation to parent of subsidiary's contacts where parent did not control day-to-day operations of subsidiary even though three of five [of the parent's board members] sit on [the subsidiary's] four member board"); *Thunderbird Motor Freight Lines v. Consolidated Pipe & Supply Co., Inc., of Missouri*, 623 F.Supp. 4, 6 (E.D.Mo.1983) (finding "the mere fact, if so, that the two corporations may have interlocking officers and directors does not demonstrate that [the parent] controls, dictates or actively participates in the day-to day management and business opera-

tions of its subsidiary"); *see also Wehner v. Syntex Agribusiness, Inc.*, 616 F.Supp. 27, 30 (E.D.Mo.1985); *United States v. Bliss*, 108 F.R.D. 127, 131–32 (E.D.Mo. 1985).

The Court will thus, turn to whether the contacts of either KBA Germany or KBA NA with Iowa warrant in personam jurisdiction in their own right.

*(ii) Five Factor Test:*

■ *Quality and nature of the contacts:* The quality and nature of the KBA Defendants' acts favor jurisdiction. Both companies have sold custom-made presses in Iowa. The four presses here netted at least $12,928,000 in revenue for both KBA companies. The companies also bid on another $30,000,000 sale to the Des Moines Register and an $11 million sale to Lee Enterprises, and solicited or made proposals for other sales.

The nature of the business dealings also required substantial contacts with Iowa. KBA NA sent five employees to Iowa for nearly half a year to install the Mason City press. To develop business, KBA NA's salesperson, Richard Hirst, made personal sales calls to Iowa's major newspapers several times a year. Senior management from KBA Germany and KBA NA visited Iowa to meet with customers and negotiate contracts. KBA NA exchanged numerous letters, facsimiles, and telephone calls with Iowa.

*Quantity of the contacts:* The quantity of the Defendants' contacts in Iowa also support an exercise of jurisdiction over the Defendants. Goss contends that the KBA Defendants have had at least 3,274 contacts with Iowa. As to Mason City alone, the KBA Defendants made 1,502 telephone calls and spent 651 personal days in Iowa during this period. They called Des Moines 584 times, exchanged over two dozen pieces of correspondence, and visited

for 11 personal days. The KBA Defendants sold four major presses in Iowa and bid on three more. They advertised to hundreds of members of the Iowa newspaper industry and they maintain a website that is continuously accessible in Iowa.

*Relation of the cause of action to the contacts:* Goss contends the Defendants' contacts are a basis for this Court to exercise both general and specific jurisdiction. Because this Court finds the Defendants' contacts with Iowa are sufficient to support the exercise of general jurisdiction it will not address Goss' argument based on specific jurisdiction.

A defendant may only be subject to "general jurisdiction" where the defendant's contacts with the forum are "continuous and systematic." *Helicopteros,* 466 U.S. at 414 n. 9, 416, 418–19, 104 S.Ct. 1868 (finding no jurisdiction because corporate defendant's forum contacts were not "of a continuous and systematic" nature); *Perkins v. Benguet Consolidated Mining Co.,* 342 U.S. 437, 448, 72 S.Ct. 413, 96 L.Ed. 485 (1952) (corporation carried on "continuous and systematic" activities within forum). Goss alleges that the KBA Defendants have employees who have spent over 672 personal days in Iowa, exchanged correspondence with Iowa at least 59 times, and made more than 2,500 telephone calls to the state. Additionally, both companies are alleged to have solicited business here, and both companies have regularly advertised in this state between 1995 and 2000. Because of the size, complexity, and ongoing nature of the contacts, KBA Germany and KBA NA have had contacts with the state almost every month throughout this period.

The Defendants argue that KBA NA's contacts with Iowa were primarily to address technical problems with its presses and general maintenance, and KBA NA's actual solicitation of sales in Iowa was much less. Specifically, the Defendants contend that KBA NA personnel spent only 12.5 days in Iowa for sales and the remaining time was in relation to non-sales oriented matters. These are, of course, factual disputes that must be resolved in Goss' favor at the motion to dismiss stage. Moreover, this Court is not convinced the Defendants continuous contact with the state based on its sales relationship with its customers, be it for maintenance or continued sales of alternate parts, is materially different than contact based on solicitation of wholly new bids for purposes of personal jurisdiction.

*Interest of the forum state and the convenience of the parties:* Factors four and five, which receive less weight than the first three, *see Wells' Dairy v. Estate of Richardson,* 89 F.Supp.2d 1042, 1050 (N.D.Iowa 2000), support the Court's exercise of jurisdiction as well. Viewing the facts in a favorable light to Goss, the Defendants' allegedly illegal conduct resulted in partial closure of its Cedar Rapids, Iowa facility and as a result a significant number of layoffs of Iowa workers. This would likely give rise to this State's interest in the resolution of Goss' claim. With regard to convenience of the parties, Iowa is the situs of two of the major transactions at issue in this case which makes this district on par with most any other district in the country.

After a thorough review of the record this Court finds Goss has made a prima facie case of personal jurisdiction for both KBA Germany and KBA NA. Viewing the facts in light most favorable to Goss, Defendants KBA Germany and KBA NA appear to have made continuous and systematic contacts with Iowa which warrant this Court's exercise of general jurisdiction. Having said this, the Court notes there appear to be significant factual disputes with regards to KBA Germany's role in the bidding processes, in particular its contacts with *Lee Enterprises* and the *Des Moines Reg-*

*ister.* In reviewing the record to determine each company's contact with Iowa, the Court was often faced with evidence that simply referred to 'KBA', without specifying which company was at issue. This was due, in part, to the fact that many of those people deposed were unaware that KBA Germany and KBA NA were distinct companies and thus referred to them as one. *See e.g., Rickman Decl.* ¶ 5 (stating I understood KBA or Koenig & Bauer to be a single entity. I was never advised that Koenig & Bauer AG and KBA North America, Inc. (together "KBA")) were separate companies; *Ryan Dep.* at 10 and 13 (stating "In all my dealings, I've never recognized them as separate companies" and "when I say 'KBA' it's the company, whether it's the German or the U.S. arm"); and *Query Dep.* at 112 (stated he failed to see a difference between the two companies). The Court therefore finds it prudent to note that while Goss has made out a prima facie showing of jurisdiction sufficient to survive a motion to dismiss, Goss must still establish. personal jurisdiction over each defendant by a preponderance of the evidence at trial. *See Dakota Industries,* 946 F.2d at 1387.

### 3. *Venue*

■ The Antidumping Act contains a venue provision which allows a suit to be brought in "the district in which the defendant resides or is found or has an agent..." 15 U.S.C. § 72. Additionally, the general federal venue statute at 28 U.S.C. § 1391(b) compliments the venue provision of the 1916 Act. *See Pure Oil Co. v. Suarez,* 384 U.S. 202, 204–05, 86 S.Ct. 1394, 16 L.Ed.2d 474 (1966) (underlying enactment of 28 U.S.C. § 1391 and the generality of its language suggest it is intended to broaden specific venue requires of statutes prior to the 1948 enactment of 28 U.S.C. § 1391); *Monument Builders of Greater Kansas City, Inc. v. American Cemetery Ass. of Kansas,* 891

F.2d 1473, 1477–79 (10th Cir.1989), *cert denied,* 495 U.S. 930, 110 S.Ct. 2168, 109 L.Ed.2d 498 (1990). It provides in relevant part "a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." 28 U.S.C. § 1391(c). Accordingly, because this Court finds Goss has established a prima facie case of personal jurisdiction over both KBA Germany and KBA NA in this Court, they are deemed to reside in this district and venue is effectively appropriate over both companies.

### IV. *CONCLUSION*

For the reasons stated herein, the motions to dismiss by Defendants MAN Roland Druckmaschinen Aktiengesellschaft, MAN Roland, Inc., Koenig & Bauer Aktiengesellschaft, KBA North American, Inc., Mitsubishi Heavy Industries, Ltd., and MLP U.S.A. Inc are denied. The Defendants Tokyo Kikai Seisakusho, Ltd., and TKS (U.S.A.) Inc.'s motion to dismiss is also denied.

Recently, Defendant MAN Roland Druckmaschinen Aktiengesellschaft re-urged this Court to stay the proceeding pending the repeal of the 1916 Act, submitting new evidence about the United States' intention to comply with the recent WTO determination against the 1916 Act. For the reasons stated by the Court in its earlier ruling on Defendant's motion to stay, Defendant MAN Roland Druckmaschinen Aktiengesellschaft's motion is also denied.

### ORDER

Accordingly, IT IS ORDERED:

The Defendants MAN Roland, Inc., Koenig & Bauer Aktiengesellschaft, KBA North American, Inc., Mitsubishi Heavy Industries, Ltd., and MLP U.S.A. Inc.'s motion to dismiss is DENIED. (Doc. 68).

The Defendants Tokyo Kikai Seisakusho, Ltd., and TKS's motion to dismiss is DENIED. (Doc. 59).

The Defendants MAN Roland Druckmaschinen Aktiengesellschaft motion to dismiss is DENIED. (Doc. 146).

